571 A.2d 1286

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ROCHELLE DINEENE KELLY,
DEFENDANT–APPELLANT.

Argued November 28, 1989—Decided April 4, 1990.

*Claire Drugach,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Timothy J. McNamara,* Assistant Prosecutor, argued the cause for respondent (*Paul T. Koenig, Jr.,* Mercer County Prosecutor, attorney).

*Tanya Y. Justice,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Peter N. Perretti, Jr.,* Attorney General, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

Defendant, Rochelle Kelly, repeatedly slashed Randolph Boone on a street corner in Trenton, with a carpet-cutting razor. She had recently broken off her tumultous relationship with Boone because on many occasions he had beaten her severely. Approximately four hours before defendant slashed him, Boone had warned defendant in a threatening manner not to walk around the corner where he usually spent his free time. Defendant armed herself with a razor before she went outside, in case she needed to defend herself against Boone. When she crossed the corner in question, Boone allegedly began to punch her, whereupon she slashed him with the razor.

The jury acquitted defendant of aggravated assault, *N.J.S.A.* 2C:12–1, and possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d, but convicted defendant of possession of a weapon "under circumstances not manifestly appropriate for such lawful uses as it may have," *N.J.S.A.* 2C:39–5d (hereinafter section 5d). The narrow issue presented is whether the trial court erred in refusing to instruct on self-defense as a justification to the section 5d offense. We hold that the trial court did not err in refusing to give the self-defense instruction. Self-defense does not excuse possession of a weapon in violation of section 5d except in "those rare and momentary circumstances where an individual arms himself spontaneously to meet an immediate danger." *State v. Harmon,* 104 *N.J.* 189, 208–09, 516 *A.*2d 1047 (1986).

## I

The testimony established that Boone had been Kelly's live-in companion and the father of her daughter. She had broken off her relationship with him because he physically abused her. Kelly testified that in the ten months they lived together, Boone had fractured her nose three times, knocked out her teeth and punched her face, eyes, and back causing bruises and abrasions. She had gone to the hospital at least once because of a broken nose. Kelly stated that Boone kept guns in the house and also threatened her with knives. She alleged that the abuse frequently occurred after Boone had smoked marijuana laced with phencyclidine.

Boone did not dispute that he beat Kelly during their relationship or that he caused the injuries she described. He stated, however, that Kelly had also hit him numerous times.

After Kelly ceased living with Boone, she moved with her baby to an apartment shared by other women who also knew Boone. Boone began to visit Kelly's household on the pretext that he wished to communicate with her roommates. In reality, however, he used his visits in an attempt to regain Kelly's affections. When he realized the futility of his efforts, he allegedly began to harass her. On July 18, 1984, Boone came to Kelly's apartment at about 4:30 p.m. Kelly testified that when she asked Boone to leave, he started calling her names and threw her against the wall. She then picked up a box-cutter-type razor that she had been using to cut carpet and brandished it in an effort to ward him off. When one of Kelly's roommates entered the room, she asked Boone to leave. Before leaving, Boone warned defendant not to "come around the corner."

Kelly explained that Boone was referring to the corner of Walnut and Monmouth Streets in Trenton where he usually "hung out." The "corner" was approximately a block away from defendant's apartment, and Kelly interpreted Boone's statement as a threat that he would assault her if she went

there. Because prior attempts to gain the assistance of police had proven ineffective, she did not notify the police. Because Boone lived only a few blocks away, Kelly believed that she could not avoid encountering him.

Denying that his visit was unexpected, Boone claimed that Kelly had asked him to the house. He admitted he threw her against the wall, but only after Kelly had threatened him with the carpet cutter during the course of the argument.

At approximately 6:30 p.m., Kelly and her roommate took Kelly's daughter to a neighborhood park. They had dressed the child in a little sailor suit and wanted to take pictures of her playing. Due to Boone's threat, prior to leaving her apartment Kelly deliberately armed herself with the cutter to protect herself in the event that she met Boone. At 8:30 p.m., Kelly, her daughter and a friend headed home from the park. To get there, they crossed the intersection of Monmouth and Walnut Streets. For approximately five minutes, Kelly remained at the corner talking with a man she knew, and having her picture taken with her daughter in front of a store. Boone appeared and accosted Kelly, but there are conflicting versions of the ensuing events.

Boone testified that he had stopped Kelly in order to ask her to take their daughter home because the hour was late, but that defendant refused his request. He further alleged that they began to argue and that Kelly then cut him with a razor. Boone contended that he had neither touched nor threatened Kelly prior to the time that she started slashing at him, and that he was "already cut when [he] put his hands on her."

Thurman Jennings, an acquaintance of Boone's, provided a different account. He stated that the fight started when Boone began hitting Kelly with his fists. Jennings testified that Kelly could not ward off Boone's blows. Boone hit Kelly for approximately ten minutes, then Kelly took out the carpet cutter:

When she took out the razor at the time [Boone] saw it but look, like, look like to me he ain't care whether she had it or not. So, still throwing punches at her and so that's where he grabbed her, she just started swinging and cut.

Jennings also testified that Boone had told him earlier that evening that he was waiting for Kelly to come around the corner, in order to "beat her up." Mr. Jennings also reported that at least three or four men tried to pull Boone off Kelly, but were unsuccessful until Boone was injured.

According to Kelly, when Boone asked her to take her daughter home, she replied that "she'll stay here as long as I'm here," whereupon Boone started swearing at her. He took a swing at her, but missed, and then punched her at least three times. He was aiming for her face, but hit her primarily on the arms. She backpedaled to retreat, but Boone continued to swing at her. She turned to run away and Boone hit her in the ear. She explained that at this point she "saw stars" and that

[a]ll I could hear was ringing and I just turned around and I had the razor in my hand and I—I don't know if I was cutting him or not, I just, you know, [kept] swinging.

She remembered "tussling" and swinging the razor at Boone, merely to "get him off me and keep him away from me." She did not initially realize that she had cut him. She also recalled that several people had unsuccessfully attempted to intervene and that she had screamed "get him off me."

The fight ended when Boone realized that he was injured. Boone was taken to the hospital where he received 128 stitches for superficial wounds to his head, face, and back.

Approximately one hour later, Kelly voluntarily informed the police that she had cut Boone with a piece of glass because she could not get the carpet cutter open. On direct examination, Kelly admitted that she had lied because "I knew I wasn't supposed to carry a razor. That was the reason that I said glass." On cross-examination, she again contended that she did not intend to hurt Boone, but only used the razor in self-defense as she "didn't want to get hurt by him anymore." Defense counsel stipulated that the razor was not being used as a carpet

cutter at the time of the altercation and that it was not an instrument defendant used in her employment.

The trial court charged the jury on section 5d as follows:

Concerning the phases "under the circumstances not manifestly appropriate for such lawful uses as it may have," I instruct you that phrase means that the State has the burden of proving beyond a reasonable doubt that the possession of the weapon in question by the defendant at the time in place in question and under all of the circumstances presented clearly demonstrated that the defendant's possession of that weapon was not for any lawful use or lawful purpose which that razor would otherwise normally have had.

Without objection from the State defense counsel requested the trial court to instruct the jury on self-defense with respect to the section 5d count. Relying on *State v. Harmon, supra,* 104 *N.J.* at 189, 516 *A.*2d 1047, the trial court refused, holding that a self-defense instruction applied to a section 5d charge only when a factual question exists about whether the possession occurred in a situation of immediate or imminent danger. Because Kelly admittedly had armed herself in anticipation of future harm, the trial court concluded that as a matter of law, no such imminent danger existed. Specifically, the court instructed the jury that the concept of "self-protection" could be used as a defense to aggravated assault, but could not be used as a defense to both weapon charges:

The defense of self protection as I have outlined that defense ... is only applicable to the charge of aggravated assault under the first count of this Indictment and does not apply to either count two or three involving the charge of possession of a weapon for unlawful purpose and unlawful possession of a weapon *since one may not arm himself or herself with a weapon in anticipation of a future possible need to use that weapon in self protection.* This in no way alters the State's burden of proof under those two counts of the Indictment to prove beyond a reasonable doubt each and every one of the elements required to be proven under the two counts of the Indictment as to this defendant. (Emphasis added).

Defense counsel objected to the omission of a self-defense charge on the ground that a factual question existed concerning the immediacy or imminence of the danger.

The jury deliberated a little over a hour, and then asked the court to redefine unlawful possession of a weapon, whereupon the court reinstructed the jury on that offense. After another

twenty minutes, the jury returned a verdict finding Kelly not guilty of aggravated assault, contrary to *N.J.S.A.* 2C:12–1b(1), and possession of a weapon for unlawful purpose, contrary to *N.J.S.A.* 2C:39–4d, but guilty of unlawful possession of a weapon, contrary to *N.J.S.A.* 2C:39–5d. Defendant was sentenced to a one year term of probation with a Violent Crimes Compensation Board penalty of $250.00.

The Appellate Division affirmed the trial court's refusal to charge as defendant had requested, anticipatory self-defense as a defense to a section 5d charge. 226 *N.J.Super.* 267, 271, 543 *A.*2d 1055 (1988). The court below found that self-defense was an available defense to a section 4d charge because it negated the element of intent to use the weapon for a criminal purpose. However, the Appellate Division concluded, as did the trial court, that this defense was not available to a charge of unlawful possession:

> [I]n *State v. Lee,* 96 *N.J.* 156, [475 *A.*2d 31] (1984), the Supreme Court carefully distinguished section 4d from section 5d and specifically held "the Legislature did not require proof of intent to use a weapon for an unlawful purpose as an element of a violation of 2C:39–5d."
>
> \*      \*      \*      \*      \*      \*      \*      \*
>
> Because section 5d is a possessory offense which does not require a purpose to use the weapon unlawfully, defendant's precautionary arming with a razor in anticipation of a confrontation with Boone does not negate an element of the offense and is not a defense. Ironically, the fact that she possessed the razor in anticipation of encountering Boone supports a finding of guilt. As *Lee* explained, enactment of section 5d criminalized the possession of useful devices "capable of lethal use or of inflicting serious bodily injury," *N.J.S.A.* 2C:39–1(r), in circumstances in which the emphasis is on the device's value as a weapon and in which the device poses a likely threat of harm to others. By criminalizing possession of these devices in such circumstances, the Legislature has sought to interdict the introduction of weapons into contexts in which they may be used to harm others regardless of the benign or innocent intent of the possessor. [226 *N.J.Super.* at 269–70, 543 A.2d 1055].

The court found that this case did not fall within the *Harmon* "immediate danger" exception where self-defense should be "considered." *Id.* at 270, 543 A.2d 1055 (quoting *State v. Harmon, supra,* 104 *N.J.* at 208–09, 516 *A.*2d 1047).

We granted defendant's petition for certification. 114 *N.J.* 474, 555 *A.*2d 601 (1989).

## II

A.  *Prior Caselaw and Legislative History*

The analysis of this case necessarily follows from our prior decisions in *State v. Lee, supra,* 96 *N.J.* at 156, 475 *A.*2d 31, and *State v. Harmon, supra,* 104 *N.J.* at 189, 516 *A.*2d 1047.  *Lee* upheld the constitutionality of section 5d, and *Harmon* addressed the issue of when self-defense may be used under the sections of Chapter 39, *N.J.S.A.* 2C:39–3, –4 and –5, that regulate the use and possession of various weapons.  In *Lee,* we affirmed the section 5d conviction of a defendant who taped a pair of scissors to form a stiletto.[1]  We held that section 5d was constitutional.  Both cases define section 5d as proscribing possession of weapons regardless of the possessor's intent. *Lee* and *Harmon* make clear that allowing anticipatory self-defense as a justification for a section 5d offense is inconsistent with the "carefully constructed scheme for the criminalization of possession of weapons in various situations" outlined by the Legislature in *N.J.S.A.* 2C:39–3, –4, and –5.  *State v. Lee, supra,* 96 *N.J.* at 160, 475 *A.*2d 31.

*N.J.S.A.* 2C:39 regulates firearms as well as other dangerous weapons and instruments of crime.  Sections 3, 4, and 5 define offenses that could arise as a result of the possession of weapons and devices.  Section 3 makes the mere possession of certain weapons such as sawed-off shotguns a *per se* offense. *N.J.S.A.* 2C:39–3b.  That section also prohibits possession of instruments such as dirks, daggers, and stilettos unless a defendant can offer a legitimate explanation for such posses-

---

[1] In *State v. Wright,* 96 *N.J.* 170, 475 *A.*2d 38 (1984), a companion case to *Lee,* we likewise affirmed the conviction under section 5d of defendant who had an exacto knife with an eight-inch handle and one-inch razor-like blade strapped to his ankle inside his sock.

sion. *State v. Lee, supra,* 96 *N.J.* at 160, 475 *A.*2d 31. Section 4 prohibits possession of a weapon with the "purpose to use it unlawfully against the person or property of another." *N.J. S.A.* 2C:39–4a to 4d. Section 5 makes the possession of certain unlicensed weapons, such as machine guns, handguns, rifles, or shotguns, a *per se* offense. That offense is punishable as a crime of the third degree or fourth degree, regardless of the intent of the possessor or circumstances surrounding the possession. *N.J.S.A.* 2C:39–5a to 5c; *State v. Lee, supra,* 96 *N.J.* at 161, 475 *A.*2d 31. In addition, section 5d prohibits possession of any other weapon "under circumstances not manifestly appropriate for such lawful uses as it may have." *N.J.S.A.* 2C:39–5d.

Sections 5 and 3 are similar in that they both prohibit certain weapons regardless of the legitimacy of the possessor's purpose or intent. They differ because section 3 prohibits the possession of some inherently dangerous devices such as sawed-off shotguns, silencers, and armor piercing bullets, whereas section 5 prohibits a narrower class of weapons such as machine guns, and allows possession of those devices to be sanctioned by permit or license. *Ibid.* Section 4, in contrast, punishes only offenders who have "a purpose to use the device unlawfully against the person or property of another." *N.J. S.A.* 2C:39–4. Violations under section 4 are, for the most part, second degree offenses that carry a presumption of incarceration, *N.J.S.A.* 2C:44–1(d), and trigger the parole-ineligibility provisions of the Graves Act. *N.J.S.A.* 2C:43–6(c). Violations under sections 3 and 5 constitute third and fourth degree offenses and carry a presumption under *N.J.S.A.* 2C:44–1(e) of non-incarceration for first-time offenders. *State v. Harmon, supra,* 104 *N.J.* at 197–98, 516 *A.*2d 1047; *State v. Lee, supra,* 96 *N.J.* at 161, 475 *A.*2d 31.

Those three sections reveal that the Legislature carefully constructed a comprehensive, statutory design for law enforcement. *State v. Lee, supra,* 96 *N.J.* at 160, 475 *A.*2d 31; *State v. Harmon, supra,* 104 *N.J.* at 196–97, 516 *A.*2d 1047; *State v.*

*Ingram,* 98 *N.J.* 489, 499, 488 *A.*2d 545 (1985). They "reflect a careful mix of possessory offenses that combine purely regulatory proscriptions requiring no wrongful intent with more serious crimes requiring criminal culpability on the part of the accused." *State v. Harmon, supra,* 104 *N.J.* at 198, 516 *A.*2d 1047. They are however not mutually exclusive. "The possession of a particular weapon can be prohibited under one or more of the categories, depending upon the intent of the possessor or the circumstances surrounding the possession." *State v. Lee, supra,* 96 *N.J.* at 161, 475 *A.*2d 31.

In *Lee,* we held that "intent" to use a weapon for an unlawful purpose is not an element of section 5(d), *id.* at 164, 475 *A.*2d 31, because "[t]he criminalization of the possession of a weapon with intent to use it unlawfully against another is carried forward in 2C:39–4d. Hence, reading a requirement of an unlawful intent into 2C:39–5 would render that section superfluous." *Id.* at 162–63, 475 *A.*2d 31. As a possessory offense, section 5d does not require a *purpose* to use a weapon unlawfully. Section 5d is part of a legislative scheme tailored to address different aspects of weapon possession. Section 5d punishes possession, without considering intent, in contrast to section 4d, which includes intent as an element of the offense.

In *Harmon,* defendant was convicted of violating *N.J.S.A.* 2C:39–4a, "possession of [a] firearm with a purpose to use it unlawfully," for drawing a BB gun during an argument with another person and threatening to use it. 104 *N.J.* at 191, 516 *A.*2d 1047. The defendant alleged that his only purpose in arming himself was precautionary and that he never intended to commit an illegal act.

We held that although intent was an element of a section 4a offense, it was largely irrelevant in the context of a 5d offense. Because section 5d is a strictly possessory offense, the Court found that self-defense rarely constitutes a defense to such a charge. After reviewing various cases from other jurisdictions involving attempts to excuse gun possession under regulatory

offenses that require no criminal intent or purpose on the part of the accused, the Court explained the distinction between section 4a and section 5d offenses:

> We ... do not believe that [under section 4a] the Legislature intended to subject to the second-degree offense and to the mandatory imprisonment required by the Graves Act the individual who concededly possesses a weapon, but does so for a precautionary, sporting, or otherwise benign purpose. *In such circumstances, the structure of the Code suggests a legislative judgment that the less-culpable state of mind be punished as a regulatory offense under sections 39–3 or 39–5.b.*
>
> [*State v. Harmon, supra,* 104 *N.J.* at 200, 516 *A.*2d 1047 (emphasis added).]

And footnote 6 to that quote is particularly pertinent:

> Contrary to the suggestion made by the State, our holding here will not encourage a wholesale arming of the populace. *Individuals who arm themselves with firearms anticipatorily on the apprehension of future danger would quickly find that they could not do so with impunity. Although their asserted precautionary purpose might insulate them from conviction under section 39–4(a), they would still be exposed to criminal liability under the regulatory provisions of sections 39–3 and –5.*
>
> [*Id.* at 200 n. 6, 516 *A.*2d 1047 (emphasis added).]

Further in *Harmon,* we stated:

> We agree wholeheartedly that in such cases the policies embodied in our gun control laws, *N.J.S.A.* 2C:39–3 and –5, would not allow self defense as an excuse or justification to a *charge of unlawful possession under a regulatory offense when a person arms himself prior to a danger becoming imminent. Only in those rare and momentary circumstances where an individual arms himself spontaneously to meet an immediate danger should the justification afforded by N.J.S.A. 2C:3–4 be considered.*
>
> [*Id.* at 208–09, 516 *A.*2d 1047 (emphasis added).]

■ Accordingly, the carefully instructed legislative plan embodied in *N.J.S.A.* 2C:39, together with a review *Lee* and *Harmon* establishes that a jury charge on self-defense is largely inapplicable in the context of section 5d offenses. If a person possesses an instrument for a legitimate purpose and makes immediate use of that instrument as a weapon in order to fight off an impending threat, then, and only then, is self-defense a justification to a section 5d offense. In such a case, the person would not have possessed the implement to use it as a weapon but for its proper purpose. Absent possession of the implement as a weapon, a person has not committed a section 5d offense.

In *Lee* we recognized the Legislature's intent in enacting section 5d as follows:

The obvious intent of the Legislature was to address a serious societal problem, the threat of harm to others from the possession of objects that can be used as weapons under circumstances not manifestly appropriate for such lawful uses as those objects may have. Some objects that may be used as weapons also have more innocent purposes. For example, a machete can be a lethal weapon or a useful device for deep sea fishing. *See State v. Hay*, 153 *N.J.Super.* 346, 349 [379 *A.*2d 858] (App.Div.1977). A steak knife is appropriate, at the dinner table, but is sinister when concealed in a car with a BB gun. *See In re T.E.T.*, 184 *N.J.Super.* 324 [446 *A.*2d 177] (App.Div.1982).

The underlying problem is protecting citizens from the threat of harm while permitting the use of objects such as knives in a manner consistent with a free and civilized society. The statute addresses the problem of outlawing the possession of various weapons in circumstances when they pose a likely threat of harm to others. In striking a balance, the Legislature recognized that an otherwise innocent object can become a threat. *See* Robinson, *Imputed Criminal Liability*, 93 *Yale L.J.*, 609, 626 (1984) ("[p]ossession offenses seek to prohibit and punish not possession itself, but harmful conduct, past or future, that is evidenced by the possession."). [96 *N.J.* at 161–62, 475 *A.*2d 31].

The fact that many instruments have both legal and illegal uses explains the legislative purpose underlying section 5d. The statutory design of section 5d implicitly avoids the pitfalls of relying solely on a statutory list of prohibited weapons. A statutory list would potentially fail to filter out makeshift weapons or objects that may be used as weapons or for more innocent purposes.

In using general language, the legislature intended to allow juries and judges to define, through the use of their own community standards and through an evaluation of the relevant facts and circumstances, what constitutes manifestly inappropriate possession of an object in each individual case. Section 5d allows for this interstitial interpretation because it is impossible to provide a detailed statutory catalogue of every rudimentary object that could be put to baleful use, or of the myriad of circumstances that could give rise to such inappropriate possession. *State v. Lee*, 96 *N.J.* at 166, 475 *A.*2d 31 ("It is doubtful that a legislator, no matter how meticulous would have thought of including scissors taped into a stiletto on a list of prohibited weapons."); *State v. Colon*, 186 *N.J.Super.* 355,

452 *A.*2d 700 (App.Div.1982) (section 5d was not unconstitutionally vague because it gave sufficient notice that conduct charged was criminal). Thus, the Legislature adopted a general provision, section 5d to permit the lawful use of objects such as razors, while anticipating the ingenuity that can turn everyday objects into weapons.

B. *Application of Section 5d*

■ In reviewing the Section 5d conviction, we first must determine whether Kelly's possession of the carpet cutter was unlawful under section 5d. *See State v. Latimore*, 197 *N.J.Super.* 197, 210, 484 *A.*2d 702 (A.D.1984) (To prove possession of weapon, state must show intentional control and dominion, the ability to affect physically and care for item during a span of time, accompanied by knowledge of its character). The State proved that Kelly possessed the carpet cutter for the purpose of using it as a weapon. *State v. Blaine*, 221 *N.J.Super.* 66, 70, 533 *A.*2d 980 (App.Div.1987) (State must prove possession and circumstantial culpability). Kelly testified that she put the weapon in her pocket before going outside in order to protect herself from a potential attack by Boone. Kelly thus intentionally carried the razor for at least two hours for the purpose of using it as a weapon.

■ The next question then concerns whether anticipatory self-defense excuses unlawful possession of the weapon in this instance. New Jersey courts have previously rejected the contention that self-defense justifies possession of a weapon prohibited *per se* by the Legislature. *See State v. Colon*, 186 *N.J.Super.* 355, 357, 452 *A.*2d 700 (App.Div.1982) ("The issue is not whether a weapon could be lawfully used, but whether the circumstances surrounding the possession were manifestly appropriate for such lawful uses."). The permissible use of a weapon does not legitimate its impermissible possession.

Other jurisdictions have also interpreted statutes issuing *per se* prohibitions on the possession of certain weapons generally

to exclude self-defense as a justification for unlawful possession. See *Hurt v. United States*, 337 *A.*2d 215, 217 (D.C.1975) (rejecting defendant's contention that self-defense is justification to violation of *per se* offense of carrying pistol without license in absence showing of threat of immediate harm); *State v. Hart*, 66 *Idaho* 217, 220–221, 157 *P.*2d 72, 73 (1945) (rejecting argument of defendant charged with violation of city ordinance prohibiting concealed weapons that ordinance was unconstitutional); *Johnson v. State*, 256 *Ind.* 497, 504–507, 269 *N.E.*2d 879, 883–84 (1971), *cert. denied*, 405 *U.S.* 921, 92 *S.Ct.* 958, 30 *L.Ed.*2d 792 (1972) (rejecting contention of defendant charged with *per se* offense of carrying pistol without license that possession became lawful when weapon is used in self-defense); *State v. Walton*, 311 *N.W.*2d 113, 114–15 (Iowa 1981) (rejecting defendant's argument that defense of self-protection applies to *per se* regulatory offenses of carrying weapons and of receipt, transportation, or possession of weapon by felon absent showing of immediate and imminent threatened harm); *Medley v. State*, 52 *Md.App.* 225, 231–237, 448 *A.*2d 363, 366–69 (1982) (rejecting defendant's argument that he had right to arm himself in reasonable anticipation of a future attack as valid defense to *per se* regulatory offense of wearing, carrying, or transporting handgun); *Commonwealth v. Lindsey*, 396 *Mass.* 840, 489 *N.E.*2d 666 (1986) (rejecting defendant's argument that reasonable apprehension of future serious bodily harm is defense to charge of *per se* regulation that one may lawfully carry firearm only with license or if qualified for specific statutory authorization even though defendant had been previously attacked by victim and was pressing criminal charges against victim at the time that defendant shot victim in self-defense); *People v. Townsel*, 13 *Mich.App.* 600, 601, 164 *N.W.*2d 776, 777 (1968) (rejecting defendant's argument that carrying a weapon for self-defense is a defense to a prosecution for carrying a concealed weapon); *People v. Bieniek*, 60 *A.D.*2d 777, 778, 400 *N.Y.S.*2d 640, 641 (1977) (rejecting defendant's contention that his unlawful possession of weapon in anticipa-

tion of a future need for self-defense was justified because the defendant had previously received threats); *Taylor v. State*, 520 *S.W.*2d 370, 370–71 (Tenn.Crim.App.1974) (rejecting defendant's contention that carrying weapon solely for purpose of self-defense is defense to charge of carrying a pistol); *Johnson v. State*, 650 *S.W.*2d 414, 415 (Tex.Crim.App.1983) (rejecting defendant's contention that feeling that one is in a "high crime" area is defense to *per se* regulatory offense that prohibits the carrying of firearms on premise licensed for the sale or service of alcoholic beverages); *Thompson v. State*, 452 *S.W.*2d 467 (Tex.Crim.App.1970) (arming in self-defense is not defense to charge of unlawful carrying a pistol). Thus while self-defense may be probative to determining unlawful intent to commit a crime, it is only relevant in the context of section 5d offenses when a defendant makes spontaneous use of a weapon in response to an immediate danger.[2]

*Harmon* defines the extraordinary circumstances that allow for a self-defense under section 5d as those in which a person makes spontaneous use of a weapon to repell immediate danger. 104 *N.J.* at 208–09, 516 *A.*2d 1047. When Kelly armed herself, the danger was in no way immediate. Had Kelly seized the weapon spontaneously and used it to defend herself against a life-threatening attack, then, she would not have possessed the weapon for a manifestly inappropriate purpose. As it stands,

---

[2]In contrast, some cases that have addressed the issue of self-defense in the context of determining whether a defendant had the requisite unlawful intent to commit a crime or to carry a weapon are irrelevant to this case inasfar as they do not concern whether a defendant was guilty of a possessory offense. *See Commonwealth v. Gonzalez*, 515 *Pa.* 98, 527 *A.*2d 106, 107–08 (1987) (evaluating the requisite mental state to be convicted under Pennsylvania equivalent of possession for unlawful purpose); *People v. Morris*, 109 *A.D.*2d 413, 414, 491 *N.Y.S.*2d 860, 861 (N.Y.App.1985) (evaluation of whether self-defense negated unlawful intent); *McBride v. United States*, 441 *A.*2d 644, 649 (D.C.1982) ("a person who possesses a 'dangerous weapon' in good faith may be guilty of a general intent weapons offense"); *Gray v. State*, 203 *Tenn.* 332, 313 *S.W.*2d 246 (1958) (self-defense in context of justification to homicide); *Townley v. State*, 355 *P.*2d 420, 440–41 (Okla.App.Ct.1960) (unlawful possession of pistol does not discount need for self-defense).

however, even Kelly acknowledged at trial that she knew she was not supposed to carry a razor but took it with her in anticipation of a confrontation with Boone. Thus, the record fully supports the jury's finding that Kelly possessed the weapon under manifestly inappropriate circumstances. Her anticipatory self-defense does not excuse the possession.

It is logical to hold that in the context of section 5d offenses, self-defense should not generally cure the infraction of wrongful possession. The jury, in acquitting Kelly of offenses that require an inquiry into intent, accurately perceived the distinction between possession and use. Although self-defense involves a lawful use of a weapon, it does not justify the unlawful possession of the weapon under section 5d except when a person uses a weapon after arming himself or herself spontaneously to repel an immediate danger. Obviously, there may be circumstances in which a weapon is seized in response to an immediate danger, but ensuing circumstances render its use unnecessary. Arguably, under such conditions the individual may take immediate possession of the weapon out of necessity, *N.J.S.A.* 2C:3–2a, rather than self-defense, *N.J.S.A.* 2C:3–4. However, it would appear that the availability of necessity as a justification for the immediate possession of a weapon, as with self-defense, is limited only to cases of spontaneous and compelling danger.

Indeed, precautionary arming during a non-emergency situation is the type of conduct that the Legislature sought to interdict under section 5d. Persons who feel threatened should communicate with the police and not take the law into their own hands. We recognize that some will consider our position unreasonable and argue that Kelly, in the face of Boone's past behavior, recent threats, and inability of the police to stop Boone from abusing her, acted reasonably in arming herself with the razor for protection. Nonetheless, that is precisely the behavior section 5d was designed to discourage. Undoubtedly Kelly found herself in a particularly difficult situation, but the answer is not to arm oneself and fight violence with violence.

The answer lies in making law enforcement more responsive so that the embattled person does not face the Draconian choice of bearing arms or withstanding the onslaught of abuse.

## III

Although defendant correctly argues that the circumstances surrounding the possession of an instrument must be considered in determining whether the possession is appropriate, defendant clearly admitted to possessing the carpet cutter *as a weapon*, not as a work-related instrument. As a matter of public policy, by criminalizing possession of weapons in anticipation of a future need for self-defense, the Legislature intended to keep instruments from being used as weapons. Hence, we hold that section 5d prohibits the possession of implements as weapons, even if possessed for precautionary purposes, except in situations of immediate and imminent danger.

Accordingly, the trial court's instruction to the jury that "one may not arm himself or herself with a weapon in anticipation of a possible need to use that weapon" was correct under the circumstances of the case. Defendant's possession of the weapon did not fall within the *Harmon* immediate danger exception.

Judgment affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.