**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3978-17T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GREGORY HYACINTHE, a/k/a
GREGORY HYACINTH,

    Defendant-Appellant.

_____

Argued December 18, 2019 – Decided April 30, 2020

Before Judges Whipple, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-07-0482.

Zachary Gilbert Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Zachary Gilbert Markarian, of counsel and on the briefs).

Milton Samuel Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Milton Samuel Leibowitz, of counsel and on the brief).

PER CURIAM

On July 19, 2016, defendant was charged in a Union County indictment with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count one); third-degree aggravated assault with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) (count two); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count three); and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:29-4(d) (count four). The charges stemmed from a physical altercation during which defendant allegedly struck Jared[1] Milon with a hammer when Milon intervened in a fight between defendant's girlfriend, Khylah Brown, and Milon's girlfriend, Sandina Depas. Following a jury trial, defendant was convicted of simple assault, as a lesser included offense of count one, and unlawful possession of a weapon, namely, a hammer, as charged in count three. He was acquitted of counts two and four. In a January 18, 2018 judgment of conviction, he was sentenced to an aggregate term of two years' probation.

On appeal, defendant raises the following point for our consideration:

> BECAUSE [DEFENDANT'S] AND BROWN'S TESTIMONY PROVIDED SOME EVIDENCE THAT [DEFENDANT] ACTED IN SELF-DEFENSE DURING THE FIGHT WITH MILON, THE TRIAL

---

[1] Alternate spellings of Jared appear in the record.

COURT ERRED IN REFUSING TO INSTRUCT THE JURY REGARDING SELF-DEFENSE AND IN REFUSING TO CHARGE MUTUAL FIGHTING, REQUIRING REVERSAL.

. . . .

[A]. THE COURT IMPROPERLY REFUSED TO INSTRUCT THE JURY THAT SPONTANEOUSLY ARMING ONESELF WITH A HAMMER IN SELF-DEFENSE CONSTITUTES LAWFUL POS[S]ESSION.

[B]. THE COURT IMPROPERLY REFUSED TO INSTRUCT THE JURY REGARDING SELF-DEFENSE AS TO THE ASSAULT CHARGES.

[C]. THE COURT IMPROPERLY REFUSED TO INSTRUCT THE JURY AS TO THE LESSER-INCLUDED CHARGE OF MUTUAL FIGHTING.

Having considered these arguments in light of the record and the applicable legal principles, we are constrained to reverse defendant's convictions and remand for retrial on both counts.

The physical altercation from which the charges arose occurred on March 26, 2016, and involved defendant, Brown, Milon, and Depas, all of whom testified at the trial. For the State, Depas testified that at approximately 11:30 p.m., there was a knock on her bedroom door. When she opened the door, she

was confronted by Brown and defendant. Brown "asked [her] if [she] was sleeping with [defendant]," to which Depas responded that "she should ask [defendant]" that question. After Brown threatened to fight Depas, Depas refused to fight and closed her bedroom door.

When Brown knocked again, Depas opened the door and a heated verbal exchange ensued, which escalated into a physical altercation between the two women, with Brown throwing the first punch. Once the two started fighting, Milon, who had been asleep on Depas's bed, "got up" and tried to separate them. At that point, defendant told Milon not to touch "[his] girl[,]" punched Depas, and started fighting Milon. According to Depas, at first, defendant punched Milon with his fists, "and then . . . defendant pulled out a hammer from his pocket" and struck Milon with the hammer.

Milon testified for the State and corroborated Depas's account. According to Milon, when Brown "barged" into the bedroom to fight, he "put [his] hands up . . . to separate them." Defendant objected to Milon touching Brown and punched Depas in retaliation. When Milon asked why he had hit Depas, defendant lunged at him, first "hitting [him] with his fist" and then "hit[ting] [him] in the head with [a] hammer." According to Milon, when defendant struck him with the hammer, he was "kneel[ing] down on the floor on [his] knees"

A-3978-17T3

while defendant was "crouched over top of [him]." Milon testified that he tried "to defend [himself]" but was unsuccessful in blocking the blows. Milon described the hammer as "a ten inch [metal] house hammer" with a "[b]rown handle." However, he did not see where the hammer came from.

Eventually, defendant and Brown left the house. At that point, Depas observed "a lot of blood all over [Milon's] shoulder," "neck," and "back." She rushed him to the hospital where he was treated with "anti-inflammatory" and "pain medication[s]" for "a broken nose," multiple abrasions on various parts of his body, "a large abrasion on his skull," and a "severe headache." Later, Depas reported the incident to the police and both she and Milon gave statements.

Brown testified for defendant and gave a different account of what transpired. According to Brown, Depas approached her on the street in Elizabeth at about 9:00 a.m. that morning and claimed "she was having sex with [defendant]," an encounter Depas denied. That evening, when Brown confronted defendant with the allegation, he denied it and an argument ensued. Skeptical of defendant's denial, Brown decided she would clear the matter up by having Depas repeat her claim in defendant's presence.

Depas and Brown lived "around the corner" from each other in Roselle and Depas's housemate, Lando Marc, was a mutual friend. Brown and defendant

arrived at Depas's house at around 11:30 p.m., after confirming with Marc that Depas was at the house. After Marc let them in, Brown knocked on Depas's bedroom door. When Depas partially opened the door, Brown demanded that Depas repeat her claim about having sex with defendant. Instead, Depas opened the door fully to reveal that her boyfriend, Milon, was asleep in the room, yelled at defendant to "[g]et [his] bitch," and slammed the door shut.

Brown knocked on Depas's bedroom door again. This time, when Depas opened the door, the two engaged in a heated verbal exchange which soon escalated into a physical altercation, with Depas making the first move. As the two women pushed and punched each other, Milon, who had awakened, intervened and punched Brown. At that point, defendant and Milon started "wrestling" on the ground and throwing punches at each other. Towards the end of the fight, both men reached for a hammer that was behind the bedroom door. Defendant grabbed the hammer first and "hit [Milon] in the back" with it. Eventually, defendant "dropped the hammer" and said "that's enough." At that point, he and Brown left the house and "went home." Brown testified that when they left, she did not see any injuries on Milon. However, the following day, the police arrested defendant. Brown denied that she or defendant brought the hammer or any other weapon to Depas's house.

A-3978-17T3

Defendant testified on his own behalf and corroborated Brown's account. According to defendant, while he and Milon were fighting on the ground, Milon reached for a hammer behind the bedroom door but defendant "jumped quicker and . . . got [the hammer]" first. After defendant grabbed the hammer, Milon tried "to get it out of [his] hand." At that point, defendant "hit [Milon] with [the hammer] in his back." Thereafter, Milon "held onto [defendant's] legs" when he tried to get up "so [defendant] hit him with [the hammer] again." Defendant testified that he grabbed the hammer "[t]o protect [him]self" because he thought Milon "was going to hit [him] with it and he could have killed [him]." According to defendant, "[he] did [not] hit [Milon] hard," and he did not intend to cause him any serious injury. "[He] just wanted to get him off of [him]." Once Milon stopped fighting him, defendant dropped the hammer and left the house with Brown. Defendant testified that when he left the house, Milon did not have any visible injuries and, contrary to Milon's description, the hammer had a black handle.

On appeal, defendant argues he "was deprived of his rights to due process and a fair trial" because the "judge's instructions regarding the counts for which [defendant] was convicted were deficient." Specifically, defendant asserts that although the judge agreed to include a self-defense instruction for count four,

7                                                                A-3978-17T3

the judge refused to charge self-defense in connection with counts one and three, and mutual fighting as a lesser included offense of simple assault.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Green, 86 N.J. 281, 287 (1981). "The trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting Green, 86 N.J. at 287-88). In fact, "[i]t is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004).

In reviewing a jury charge, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997) (quoting State v. Sette, 259 N.J. Super. 156, 190-91 (App. Div. 1992)). "Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. Bunch, 180 N.J. 534, 541-42 (2004) (quoting State v. Nelson, 173 N.J. 417, 446 (2002)); see also State v. Jordan, 147 N.J.

409, 422 (1997) (finding "[e]rroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions").

Because defendant objected to the omission of the charges, in conducting our review, if we find error, we must apply a harmless error analysis. See R. 2:10-2. "Under that standard, there must 'be "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."'" Baum, 224 N.J. at 159-60 (alterations in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

First, we address defendant's contention that the judge erred in denying his request to charge self-defense in connection with count three, unlawful possession of a weapon, N.J.S.A. 2C:39-5(d). N.J.S.A. 2C:39-5(a) to (c) "makes the possession of certain unlicensed weapons, such as machine guns, handguns, rifles, or shotguns, a per se offense . . . regardless of the intent of the possessor or circumstances surrounding the possession." State v. Kelly, 118 N.J. 370, 379 (1990). N.J.S.A. 2C:39-5(d) "prohibits possession of any other weapon 'under circumstances not manifestly appropriate for such lawful uses as it may have.'" Ibid. (quoting N.J.S.A. 2C:39-5(d)).

In <u>State v. Lee</u>, 96 N.J. 156 (1984) and <u>State v. Harmon</u>, 104 N.J. 189 (1986), our Supreme Court

> define[d] section 5d as proscribing possession of weapons regardless of the possessor's intent . . . . [and] ma[d]e clear that allowing anticipatory self-defense as a justification for a section 5d offense [was] inconsistent with the "carefully constructed scheme for the criminalization of possession of weapons in various situations" outlined by the Legislature in N.J.S.A. 2C:39-3, -4, and -5.
>
> [<u>Kelly</u>, 118 N.J. at 378 (quoting <u>Lee</u>, 96 N.J. at 160).]

In <u>Kelly</u>, our Supreme Court observed:

> [T]he carefully instructed legislative plan embodied in N.J.S.A. 2C:39, together with a review [of] <u>Lee</u> and <u>Harmon</u> establishes that a jury charge on self-defense is largely inapplicable in the context of section 5d offenses. If a person possesses an instrument for a legitimate purpose and makes immediate use of that instrument as a weapon in order to fight off an impending threat, then, and only then, is self-defense a justification to a section 5d offense. In such a case, the person would not have possessed the implement to use it as a weapon but for its proper purpose. Absent possession of the implement as a weapon, a person has not committed a section 5d offense.
>
> [118 N.J. at 381.]

"Thus while self-defense may be probative to determining unlawful intent to commit a crime, it is only relevant in the context of section 5d offenses when a defendant makes spontaneous use of a weapon in response to an immediate

10

danger." Id. at 385. Stated differently, "extraordinary circumstances that allow for . . . self-defense under section 5d" are "those in which a person makes spontaneous use of a weapon to repel[] immediate danger." Ibid. (citing Harmon, 104 N.J. at 208-09).

In Kelly, the Court

> found that no self-defense instruction was warranted in the absence of such spontaneous action during a street encounter. In that case, the defendant armed herself with a carpet-cutting razor before leaving her home to take her child out for a walk. She did so because her child's father, who had severely beaten her in the past, warned her not to walk past a certain street corner. When the defendant passed the corner, her abuser began punching her; she, in turn, slashed him repeatedly with the razor.
>
> [State v. Montalvo, 229 N.J. 300, 319 (2017) (citing Kelly, 118 N.J. at 373-75, 385-87).]

The Kelly Court "held that because the defendant armed herself with the razor before leaving her home in anticipation of using it for self-defense, a self-defense instruction was not required." Montalvo, 229 N.J. at 319 (citing Kelly, 118 N.J. at 385-87). The Kelly Court "observed, however, that if the defendant had 'seized the weapon spontaneously and used it to defend herself against a life-threatening attack, then, she would not have possessed the weapon for a manifestly inappropriate purpose.'" Ibid. (quoting Kelly, 118 N.J. at 385).

11

Here, although the judge agreed to instruct the jury on self-defense in connection with count four, possession of a weapon for an unlawful purpose, N.J.S.A. 2C:29-4(d), the judge rejected defendant's request to instruct the jury on self-defense in connection with count three, unlawful possession of a weapon, N.J.S.A. 2C:39-5(d).  Moreover, during deliberations, when the jurors asked whether they could consider self-defense in connection with count three, over defense counsel's objection, the judge responded that self-defense was "not a defense to [count three]," and only applied to count four.

We are persuaded that the judge erred in refusing defendant's request to instruct the jury on self-defense in connection with count three.  The origin of the hammer was hotly disputed, with the State contending defendant armed himself with the hammer before arriving at the scene, while the defense asserted the hammer was already at the house.  On the one hand, while the jurors could have convicted defendant on count three if they believed Depas's testimony that defendant "pulled out a hammer from his pocket" and struck Milon with the hammer, based on defendant's account, corroborated by Brown, defendant seized the hammer spontaneously to meet an immediate danger and used it to defend himself against a life-threatening attack.

Under defendant's version, he would not have possessed the weapon for a manifestly inappropriate purpose. Because defendant's account supported the self-defense justification for count three, and because defendant was acquitted of count four for which the jury considered the self-defense justification, we are convinced that the error was sufficient to raise a reasonable doubt as to whether it led the jury to a verdict it otherwise might not have reached.

We now turn to defendant's contention that the judge erred in rejecting his request to charge self-defense in connection with the aggravated assault charged in count one. "In considering whether to charge the jury on self-defense, a court should consider the circumstances that might give rise to that defense, including the defendant's and alleged aggressor's conduct, rather than the charges chosen by the prosecutor." State v. Rodriguez, 195 N.J. 165, 174 (2008). "The reality of the situation facing the defendant governs whether he had a right to engage in self-defense," ibid., and "self-defense must be charged if the evidence, viewed most favorably to the defendant, would support that justification." State v. Gentry, 439 N.J. Super. 57, 63 (App. Div. 2015). Thus, "[a]s long as a self-defense charge is requested and supported by some evidence in the record, it must be given." Rodriguez, 195 N.J. at 174.

Pursuant to N.J.S.A. 2C:3-4(a), "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion."

> [F]or defendant to prevail, the jury need not find beyond a reasonable doubt that the defendant's belief was honest and reasonable. Rather, if any evidence raising the issue of self-defense is adduced, either in the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts; acquittal is required if there remains a reasonable doubt whether the defendant acted in self-defense.
>
> [State v. Kelly, 97 N.J. 178, 200 (1984).]

Here, defendant's intent in striking Milon with the hammer as well as the number and severity of the blows were disputed. The State's witnesses testified that the blows resulted in a great deal of blood on Milon's shoulder, neck, and back, and were inflicted while Milon cowered on the floor on his knees. In contrast, defendant testified that he hit Milon with the hammer twice to protect himself from Milon's imminent use of life-threatening force. He denied striking Milon hard, and denied causing any visible injuries, an observation Brown corroborated.

In rejecting defendant's request to charge self-defense, the judge stated[2]

> [I]n terms of a test for self[-]defense, it would actually have to be for the individual to protect himself from some type of equal force. . . . [U]sing a hammer in a fist fight . . . is not self[-]defense in the same [vein] that using a . . . gun in a fist fight wouldn't be self[-]defense, a knife in a fist fight wouldn't be self[-]defense, a bat[] in a fist fight wouldn't be self[-]defense and so, a hammer in a fist fight wouldn't be self[-]defense, either.
>
> . . . [B]y his own testimony[, defendant] did not take the hammer in order to protect himself. He took the hammer out of fear, he says, that the other individual just might get it, . . . and if he did get it[,] . . . he might use it against me.
>
> But, there is . . . no proof of that, either.

Clearly, the judge misstated defendant's testimony. It was for the jury to determine whether defendant reasonably believed that the use of force, striking Milon with the hammer twice, was necessary to protect himself against the use of unlawful force by Milon. It was the judge's responsibility to determine whether there was some evidence to support the jury charge. Viewing the evidence in the light most favorable to the defense, defendant's testimony provided some evidence from which the jury could have concluded that he acted

---

[2] Initially, the judge noted that the application asserting self-defense "was . . . made out of time." However, the judge considered the application substantively as permitted under Rule 3:12-1, authorizing the court to "take such action as the interest of justice requires."

in justifiable self-defense. Indeed, based on defendant's testimony, it was Milon who brought a hammer to a fist fight.

The question of whether defendant's use of force was disproportionate under the circumstances was for the jury to decide, not the judge. If the State failed to prove beyond a reasonable doubt that defendant could not have reasonably believed in the need to use force, defendant could have been exonerated from criminal liability and acquitted of count one. Thus, we are satisfied that the error was sufficient to raise a reasonable doubt as to whether it led the jury to a verdict it otherwise might not have reached. Our conclusion is compelled by the fact that the jury acquitted defendant of count four, the only charge for which the judge provided the self-defense instruction. Moreover, the fact that the judge charged self-defense for count four reinforces defendant's contention that self-defense was supported by some evidence in the record.

Because we conclude that the judge erred in failing to charge self-defense as requested by defendant, we reverse his convictions for simple assault and unlawful possession of a weapon, and remand for a new trial. Based on our decision, we need not address defendant's contention that the judge also erred in rejecting his request to charge the petty disorderly persons offense of mutual fighting as a lesser-included offense of simple assault.

16

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION