STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RONALD
LEE, A/K/A JOHN DAVIS, DEFENDANT-APPELLANT.

Argued November 29, 1983—Decided May 7, 1984.

*Judith L. Borman,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph H. Rodriguez,* Public Defender, attorney).

*Mark Paul Cronin,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Mark Paul Cronin, Victoria Curtis Bramson* and *Catherine A. Foddai,* Deputy Attorneys General, of counsel; *Victoria Curtis Bramson* and *Catherine A. Foddai,* on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

In this case, we must determine the constitutionality of *N.J.S.A.* 2C:39–5 d, which states that a person who knowingly possesses a weapon other than certain firearms "under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime of the fourth degree."

A majority in the Appellate Division found an explicit charge on defendant's intent unnecessary "as long as the crime was defined in terms of the circumstances surrounding the possession of the weapon." 188 *N.J.Super.* 432, 435 (1982). The court described the standard of "circumstances not manifestly appropriate" for lawful uses, however, as the functional equivalent of an unlawful intent to use. *Id.* at 436.

Furthermore, the court rejected defendant's contentions that the statute was vague, overbroad, and effected an unconstitutional shift of the burden of proof to defendant. Finding that the trial court's charge adequately instructed the jury on the essential elements of the crime, including the intent to use the weapon unlawfully, the court sustained defendant's conviction. *Id.* at 435–36.

One judge dissented, asserting that the jury was not adequately instructed that an unlawful intent to use the weapon in question, a pair of scissors taped into a makeshift stiletto, was an element of the crime. *Id.* at 436, 439 (Antell, J.A.D., dissenting). The defendant, who appealed as of right because of the dissent, petitioned for certification on the constitutional issues.

We granted the petition, 94 *N.J.* 592 (1983), and now affirm the judgment of the Appellate Division. We hold, however, that an "intent to use for an unlawful purpose" is not an element of the offense, and that the statute is constitutional.

I

The Appellate Division summarized the facts:

The incident giving rise to the charges herein commenced at about 1:25 p.m. on December 8, 1979. James Whitney, an off-duty police officer, entered the kitchen from the living room of his home, at which time he heard a noise on his screen porch. Through a window of the kitchen door the officer saw defendant with his upper torso inside the screen of the porch. Whitney pursued defendant and being unable to apprehend him returned home and telephoned a central dispatch station, reporting the incident, together with a description and direction of flight of the intruder. Lee was eventually apprehended. At the time of his arrest Lee was patted down, as a result of which a pair of scissors taped at the ends, a spool of string, surgical tape and black leather gloves were recovered. Whitney subsequently recognized and identified Lee as the intruder in his home.

At the trial Sgt. Michael O'Donovan was qualified as an expert on weapons and gave his opinion that the taped scissors were useless for their traditional purpose and in the taped condition became a "stiletto." Defendant rested

> without calling witnesses or testifying. Nor did the defendant present any objection to the judge's charge.

[188 *N.J.Super.* at 434].

The jury found defendant guilty of burglary, *N.J.S.A.* 2C:18–2, of possession of burglar's tools, *N.J.S.A.* 2C:5–5, and of the offense that forms the basis for this appeal, possession of a weapon "under circumstances not manifestly appropriate for such lawful use as it may have * * *." *N.J.S.A.* 2C:39–5 d. Defendant, who had a prior criminal record, received a sentence of five years imprisonment on the burglary conviction and a concurrent sentence of eighteen months on the conviction for unlawful possession of a weapon.

In evaluating defendant's challenge to the constitutionality of 2C:39–5 d, we begin with an analysis of the relevant sections of the New Jersey Code of Criminal Justice (Criminal Code). Those sections reveal a carefully constructed scheme for the criminalization of possession of weapons in various situations, depending on the nature of the weapon, the intent of the possessor, and the surrounding circumstances. Broadly speaking, chapter 39, of which 2C:39–5 d is a part, contains three classes of possessory weapons offenses.

In the first class, the mere possession of certain weapons, such as sawed-off shotguns, constitutes a *per se* offense. *See* 2C:39–3 b. A subdivision of this category, which concerns implements such as dirks, daggers, and stilettos, makes the possession of those objects an offense unless the defendant can come forward with an explainable lawful purpose for possession of the weapon. *See* 2C:39–3 e. This provision does not relieve the State of its burden of proof, but merely shifts to the defendant the burden of going forward on the issue of "lawful purpose." *See State v. Dunlap,* 181 *N.J.Super.* 71, 76 (Law Div.1981).

A second class of offenses prohibits the possession of a weapon with the intent to use it against the person or property of another. *See* 2C:39–4 a to –4 d. The final category, describ-

ed in the subject statute, 2C:39–5 d, prohibits the possession of any weapon other than certain unlicensed firearms "under circumstances not manifestly appropriate for such lawful uses as it may have." The excepted firearms are machine guns, handguns, rifles, and shotguns, the unlicensed possession of which is, regardless of the intent of the possessor or circumstances surrounding the possession, a crime of the third degree. 2C:39–5 a to –5 c. As crimes of the third or fourth degree, violations of 2C:39–5 a to –5 d carry a presumption against incarceration for a first offender. 2C:44–1 e.

The preceding categories are useful for understanding the legislative intent, but should not be considered as mutually exclusive. The possession of a particular weapon can be prohibited under one or more of the categories, depending upon the intent of the possessor or the circumstances surrounding the possession. Quite logically, the Legislature made the possession of a given weapon a more serious crime if that possession was accompanied by an intent to use it unlawfully against another. *Compare* 2C:39–3 a (possession of a "destructive device" is a crime of the third degree) *with* 2C:39–4 c (possession of such a device with an accompanying intent to use unlawfully is a second degree crime).

In 2C:39–5 d, the Legislature addressed the situation in which someone who has not yet formed an intent to use an object as a weapon possesses it under circumstances in which it is likely to be so used. The obvious intent of the Legislature was to address a serious societal problem, the threat of harm to others from the possession of objects that can be used as weapons under circumstances not manifestly appropriate for such lawful uses as those objects may have. Some objects that may be used as weapons also have more innocent purposes. For example, a machete can be a lethal weapon or a useful device for deep sea fishing. *See State v. Hay*, 153 *N.J.Super.* 346, 349 (App.Div.1977). A steak knife is appropriate at the dinner table, but sinister when concealed in a car with a BB gun. *See In re T.E.T.*, 184 *N.J.Super.* 324 (App.Div.1982).

The underlying problem is protecting citizens from the threat of harm while permitting the use of objects such as knives in a manner consistent with a free and civilized society. The statute addresses the problem by outlawing the possession of various weapons in circumstances where they pose a likely threat of harm to others. In striking a balance, the Legislature recognized that an otherwise innocent object can become such a threat. See Robinson, *Imputed Criminal Liability*, 93 *Yale L.J.* 609, 626 (1984) ("[p]ossession offenses seek to prohibit and punish not possession itself, but harmful conduct, past or future, that is evidenced by the possession.").

The former criminal statutes contained two sections that are predecessors of 2C:39-5 d. One section criminalized the possession of a weapon "with intent to use it unlawfully against another." *N.J.S.A.* 2A:151-56. Another section, *N.J.S.A.* 2A:151-41, proscribed the possession of certain enumerated objects, including a "dangerous knife." Although this section did not expressly require an unlawful intent to use the weapon, this Court interpreted the statutory prohibition against dangerous knives to include the requirement of such an intent. *State v. Green*, 62 *N.J.* 547, 560 (1973).

We find that many of the circumstances formerly found by this Court to indicate possession of a knife with an unlawful purpose under 2A:151-41 also demonstrate possession that is not manifestly appropriate under 2C:39-5 d. As the Court stated in *State v. Green, supra,* 62 *N.J.* at 560: "surrounding circumstances—such as the size, shape and condition of the knife, the nature of its concealment, the time, place and actions of the carrier when found in his possession" indicate that the purpose of carrying the knife is its use as a weapon. Those same circumstances indicate that possession of a knife may be "not manifestly appropriate" for its lawful use.

The criminalization of the possession of a weapon with the intent to use it unlawfully against another is carried forward in 2C:39-4 d. Hence, reading a requirement of an unlawful intent

into 2C:39–5 d would render that section superfluous. *Cf. State v. Brown*, 185 *N.J.Super.* 489, 493 (App.Div.1982) (requiring "intent" under 2C:39–7 would render it meaningless in light of 2C:39–4 d).

The history of the Criminal Code, although unclear, sheds some light on whether 2C:39–5 d requires proof of intent to use a weapon for an unlawful purpose. As originally proposed, the Criminal Code defined "weapon" as "anything readily capable of lethal use and possessed under circumstances not manifestly appropriate for lawful uses which it may have." See New Jersey Law Revision Commission, New Jersey Penal Code, Volume I: Report and Penal Code 135 (1971) (proposed § 2C:39–1 p) [hereinafter cited as Volume I].

Another section in the original draft of the Criminal Code proscribed possession of weapons in general by making it a crime of the fourth degree for any person to knowingly have in his possession any firearm or weapon. See Volume I at 137 (proposed § 2C:39–3 g). As enacted, the Criminal Code moved the phrase "possessed under circumstances not manifestly appropriate for lawful use which it may have" from the definition of "weapon" into 2C:39–5 d, where it was consolidated with the provision criminalizing the knowing possession of a weapon.

Interestingly, the "not manifestly appropriate" phrase also appears in the Model Penal Code definition of "weapon," the possession of which gives rise to a presumption of criminal purpose. Model Penal Code § 5.06, 10 *U.L.A.* 504–05 (1974). Although it is the basis for many provisions in the Criminal Code, the Model Penal Code is not cited as a source for *N.J.S.A.* 2C:39–5 d. The absence of a reference to the Model Penal Code, although not essential to our analysis, tends to support the conclusion that the Legislature sought to negate proof of unlawful purpose as an element of the offense.

█ From the foregoing, we conclude that the Legislature did not require proof of an intent to use a weapon for an unlawful purpose as an element of a violation of 2C:39–5 d.

Accordingly, we disagree with both the majority and dissenting opinions in the Appellate Division insofar as they required proof of an unlawful intent to sustain the conviction. Furthermore, we overrule *In re T.E.T.*, *supra*, 184 *N.J.Super.* 324, insofar as it requires intent as an element of 2C:39–5 d.

In this case, the trial court gave the normal instruction that the defendant is presumed innocent and that the burden of proof is on the State throughout the trial. After specifically stating that the defendant has no burden of proof, the trial court read *N.J.S.A.* 2C:39–5 d as part of the charge. The court then instructed the jury that the State was obliged to prove that the taped scissors was a weapon, that the defendant knowingly possessed them, and that the possession was "under circumstances not manifestly appropriate for a lawful use." By way of further explanation, the trial court equated "manifestly" with "obviously." As previously indicated, the defendant did not object to the charge.

■ Contrary to defendant's contention on appeal, the statute does not require him "to come forth and prove that his possession is not inappropriate." That argument is invalid because, as the trial court instructed the jury, the State bears both the burden of proof and of coming forward with the evidence. Hence, the statute does not effect an unconstitutional shift in the burden of proof.

II

■ We next consider whether the statute as interpreted is unconstitutionally vague or overbroad. The first step is to determine if the statute is overbroad. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 494, 102 *S.Ct.* 1186, 1191, 71 *L.Ed.*2d 362, 369, *reh'g denied*, 456 *U.S.* 950, 102 *S.Ct.* 2023, 72 *L.Ed.*2d 476 (1982) (*Flipside*). In making that analysis, the question is whether the enactment reaches a "substantial amount of constitutionally protected conduct." *Flipside*, *supra*, 455 *U.S.* at 494, 102 *S.Ct.* at 1191,

71 *L.Ed.*2d at 369. The standard is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far in fulfilling the State's interest. *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 125 n. 21 (1983).

As a general proposition, however, the overbreadth doctrine is invoked when an enactment impinges upon first amendment rights. *See, e.g., Central Hudson Gas v. Public Serv. Comm'n of New York,* 447 *U.S.* 557, 565 n. 8, 100 *S.Ct.* 2343, 2351 n. 8, 65 *L.Ed.*2d 347, 350 n. 8 (1980); *Broadrick v. Oklahoma,* 413 *U.S.* 601, 611–12, 93 *S.Ct.* 2908, 2915–16, 37 *L.Ed.*2d 830, 839–40 (1973); *Moose Lodge No. 107 v. Irvis,* 407 *U.S.* 163, 168, 92 *S.Ct.* 1965, 1969, 32 *L.Ed.*2d 627, 634 (1972); *In Re Hinds,* 90 *N.J.* 604, 617–19 (1982). *See generally* L. Tribe, *American Constitutional Law* § 12–24 (1978); Note, *Overbreadth Review and the Warren Court,* 49 *N.Y.U.L.Rev.* 532 (1974); Note, *The First Amendment Overbreadth Doctrine,* 83 *Harv.L.Rev.* 844, 845–46 (1970). Indeed, the overbreadth doctrine emanates from the notion that "[f]irst amendment freedoms need breathing space to survive * * *." *N.A.A.C.P. v. Button,* 371 *U.S.* 415, 433, 83 *S.Ct.* 328, 338, 9 *L.Ed.*2d 405, 418 (1963).

Here, the statute does not impinge upon any first amendment right; in fact, as interpreted, it does not reach any constitutionally-protected conduct. The statute affects only the knowing possession of a weapon under circumstances "not manifestly appropriate" for lawful uses of that weapon. Hence, the statute does not fail because of overbreadth. It remains to consider the contention that the statute is unconstitutionally vague.

Vagueness "is essentially a procedural due process concept grounded in notions of fair play." *State v. Lashinsky,* 81 *N.J.* 1, 17 (1979). The vagueness test "demands that a law be sufficiently clear and precise so that people are given notice and adequate warning of the law's reach." *Town Tobacconist v. Kimmelman, supra,* 94 *N.J.* at 125 n. 21.

A penal statute should not become a trap for a person of ordinary intelligence acting in good faith, but rather should give fair notice of conduct that is forbidden. *Cf. Colautti v. Franklin,* 439 *U.S.* 379, 395, 99 *S.Ct.* 675, 685, 58 *L.Ed.*2d 596, 609 (1979) (disapproving statute that was found to be little more than a trap for those acting in good faith); *In re DeMarco,* 83 *N.J.* 25, 37 (1980); *State v. Lashinsky, supra,* 81 *N.J.* at 18. A defendant should not be obliged to guess whether his conduct is criminal. Nor should the statute provide so little guidance to the police that law enforcement is so uncertain as to become arbitrary. *Kolender v. Lawson,* 461 *U.S.* 352, ——, 103 *S.Ct.* 1855, 1860, 75 *L.Ed.*2d 903, 910 (1983).

The Legislature has considerable latitude in addressing criminal conduct. It can either prepare a detailed catalogue of proscribed activities or, within constitutional limits, address the problem more generally. *See Sanitary Vendors v. Byrne,* 40 *N.J.* 157, 166 (1963). The wisdom of a more general approach to the definition of certain possessory offenses is made manifest by the facts of this case. It is doubtful that a legislator, no matter how meticulous, would have thought of including scissors taped into a stiletto on a list of prohibited weapons.

That the prohibited behavior is not susceptible to precise definition need not lead to legislative paralysis. The words of the challenged statute are a sufficient warning so that an ordinary person "is apprised with a reasonable degree of certainty of that which is proscribed." *State v. Joas,* 34 *N.J.* 179, 187 (1961) (sustaining statute prohibiting careless driving as sufficiently specific to withstand constitutional scrutiny). Similarly, law enforcement officers are on notice that mere possession of a potential weapon is not sufficient to justify an arrest. The possession of a weapon must be knowing and "not manifestly appropriate" for such lawful uses as the object may have. *See State v. Colon,* 186 *N.J.Super.* 355, 357–58 (App. Div.1982).

 Even applying the high standard of certainty that pertains to a vagueness challenge in a criminal case, *Kolender v. Lawson, supra,* 461 *U.S.* at —— n. 8, 103 *S.Ct.* at 1859 n. 8, 75 *L.Ed.*2d at 910 n. 8, we find that the statute, as interpreted, is not "impermissibly vague in all its applications." *Flipside, supra,* 455 *U.S.* at 495, 102 *S.Ct.* at 1186, 71 *L.Ed.*2d at 369. Close cases may arise, but this is not one of them. Possible vagueness of the statute with respect to other behavior does not permit one whose conduct is clearly prohibited to act with impunity. *Flipside, supra,* 455 *U.S.* at 495, 102 *S.Ct.* at 1191, 71 *L.Ed.*2d at 369. It would be difficult to imagine a less appropriate possession of a makeshift stiletto than one on the person of an intruder into a home.

As modified, the judgment of the Appellate Division is affirmed.

CLIFFORD, J., dissenting.

If the woeful lack of precision in our public discourse has not yet reached scandalous proportions, it bodes fair soon to do so. Teetering on the brink of that hyperbole, I view today's decision as making a significant, if unwitting, contribution to the decline of exactness in speech, thereby advancing an unfortunate trend that our every effort should be bent on retarding.

Not only has the Court swept aside respected authority (*State v. Green,* 62 *N.J.* 547 (1973), and *In re T.E.T.,* 184 *N.J.Super.* 324 (App.Div.1982)) with its holding that proof of intent to use a weapon for an unlawful purpose is not required to sustain a violation of *N.J.S.A.* 2C:39-5d; it has succeeded in cloaking the statutory language "not manifestly appropriate" with wholly undeserved respectability. The first, a disregard of established case law, is one thing—an affront to the dignity of precedent, but endurable. The second, however, is quite another—an insult to civilized parlance that in this instance depreciates an indispensable characteristic of the law: concise expression and clarity of meaning. *See Oakwood at Madison,*

*Inc. v. Township of Madison,* 72 *N.J.* 481, 631, 636–67 (1977) (concurring opinion).

At the outset I would record my agreement with Judge Antell, dissenting below, that even if we were able to agree on an acceptable meaning of "not manifestly appropriate," its use presents an insurmountable obstacle to any coherence in this criminal statute.

> If read literally the statutory language would encompass countless situations which the Legislature could not have intended as the subject of prosecution. The workman carrying home a linoleum knife earlier used in his work; the paring knife inadvertently left on an automobile floor after being used for a lawful purpose; a stevedore's hook or a fisherman's gaff thrown into a vehicle and forgotten. A "weapon" could include a brick, a baseball bat, a hammer, a broken bottle, a fishing knife, barbed wire, a knitting needle, a sharpened pencil, a riding crop, a jagged can, rope, a screwdriver, an ice pick, a tire iron, garden shears, a pitch fork, a shovel, a length of chain, a penknife, a fork, metal pipe, a stick, etc. The foregoing only illustrate the variety of lawful objects which are often innocently possessed without wrongful intent, but under circumstances which are clearly not "manifestly appropriate" for their lawful use.
>
> Possession of a fork is manifestly appropriate only at the dinner table, of a bat on the athletic field, of a shovel in the garden. It cannot be reasonably concluded that this penal enactment was actually intended to apply to possession of these commonplace articles in the myriad circumstances when its appropriateness is less than "manifest." It has long been the rule that "where a literal reading of the statute leads to absurd consequences 'the court must restrain the words' and seek the true legislative intent." Furthermore, in this case a literal reading of the statute breaches the precept that "[p]enal laws must be clear enough so that 'all men subject to their penalties may know what acts it is their duty to avoid.'" [188 *N.J.Super.* at 437 (citations omitted).]

Even apart from the language problem, as Judge Antell saw it (again I agree),

> [although] the circumstances of this defendant's possession of the taped scissors suffice to support a finding of intent to use them as a weapon, the jury was not instructed that such a finding must be made as a condition to arriving at a guilty verdict. Since defendant's intent was an element of the crime charged, he was entitled to such an instruction from the court without a request that it be given. [*Id.*]

But the trouble—and more the source of this fulmination—is that "not manifestly appropriate" is so lacking in any precise meaning as to defy definition. The Court, wisely, does not even hazard one. As Judge Antell's examples demonstrate, meaning

is best ascertained by resort to illustrations—perhaps *only* that way. To invest the expression with sufficient significance as to allow its use in a criminal statute is to disparage the requirement of meticulous articulation.

"Not manifestly appropriate" drips with subjective content: what is "not manifestly appropriate" to one may be perfectly appropriate to another. Before this esoteric exercise gets out of hand, an example: I consider it to be "not manifestly appropriate"—maybe even "manifestly inappropriate" (although surely they do not carry the same meaning)—to overlook, in the company of ladies, certain amenities: the relinquishment of my seat in a public conveyance when, for want of space, a lady is obliged to stand; the removal of my hat when a lady enters the elevator; the holding of a door—that sort of thing. Some of my younger friends doubtless view this as horse-and-buggy bunkum, being of the view that observance of any of the foregoing civilities in this day and age is surely "not manifestly appropriate," and is possibly "manifestly inappropriate." Our differences are traceable at least as much to variations of meaning that inhere within such an expression as they are to our respective notions of chivalry or to a generation gap.

The point is that a phrase like "not manifestly appropriate" runs the risk, intolerable in a criminal statute, of wild swings of meaning. We should not undertake to justify its use in this statute by assuming that "we all *know* what it means."

Traditionalists revere their mother-tongue (how apt is the piety of that formulation!) not out of a perverse delight in quibbling nor * * * out of a slavish adherence to arbitrary rules and antique forms, but rather because they realize that language is the participatory instrument of intellection. From this perspective language is not simply a means of communication but also an ethical art * * *. The practice of that art involves solicitude for precision, devotion to the possibilities of imagery, and above all delight in the intricate play of word-craft—the kind of delight that follows only upon reverence. [Salemi, Book Review, 19 *The University Bookman* 45, 47 (1979) (reviewing *J. Hook, English Today: A Practical Handbook* (1976)).]

I would reverse and remand.

*For modification and affirmance*—Chief Justice WILENTZ and Justices SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For reversal and remandment*—Justice CLIFFORD—1.