**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2543-18
A-3415-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KHALIF WILLIAMS,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BRIA A. BUSH,

      Defendant-Appellant.

_____

      Argued (A-2543-18) and Submitted (A-3415-18) November 29, 2021 – Decided January 6, 2022

      Before Judges Messano and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 17-05-1393 and 17-05-1394.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant in A-2543-18 (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the brief).

Caitlinn L. Raimo, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent in A-2543-18 (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Caitlinn L. Raimo, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant in A-3415-18 (Louis H. Miron, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent in A-3415-18 (Caitlinn L. Raimo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

In these appeals, which we calendared back-to-back and now consolidate for the purpose of issuing a single opinion, co-defendants Khalif Williams and Bria A. Bush appeal from their respective convictions, and Williams challenges his sentence. We affirm.

I.

On the afternoon of December 6, 2016, Detectives Rahsaan Johnson and Phillip Reed of the Essex County Prosecutor's Office Narcotics Task Force were patrolling an area in Newark when their attention was drawn to a silver-colored car with "darkly tinted windows." Williams exited the vehicle and soon returned to it with co-defendant, Afrika Islam. Williams briefly opened the left rear door behind the driver's seat to peer inside the car before driving away with Islam in the passenger seat. The detectives "decided to perform [a] motor vehicle stop due to the tinted windows."[1]

Promptly following the stop, Islam alighted from the passenger side of the car. Reed quickly approached him and told him he was not free to leave. Johnson walked to the driver's side of the car and asked Williams for his license, insurance, and registration. As Williams handed over his documentation, Reed shouted out, "R.J., gun[!]" Although Johnson did not see the gun spotted by his partner, he reached for his own gun and trained it on Williams. Johnson commanded Williams to show his hands and not to move. Nevertheless,

---

[1] Pursuant to N.J.S.A. 39:3-75, "[n]o person shall drive any motor vehicle equipped with safety glazing material which causes undue or unsafe distortion of visibility or equipped with unduly fractured, discolored or deteriorated safety glazing material, and the director may revoke the registration of any such vehicle."

A-2543-18

Williams was observed "touching the wheel of the car" and "touching his pockets." Johnson reached into Williams's car to remove the ignition key and threw the key into the street to prevent Williams from driving away. Williams then "blade[d]" away from Johnson so Johnson could not see Williams's "front anymore." This move caused Johnson to "beg" Williams not to make him shoot him because Johnson was unable to see what Williams "was reaching for."

Seconds later, while Reed was holding Islam to prevent him from fleeing the scene, Islam broke free from the detective's grip and ran in front of Williams's car. Johnson "cut [Islam] off" and Reed grabbed Islam again before moving him to the sidewalk. As Reed reached the sidewalk, his gun fell from its holster and dropped to the ground. Reed retrieved the gun with one hand and held Islam with the other. Contemporaneously, Williams "rolled" over his front passenger seat and exited the vehicle. Reed bolted to grab Williams, prompting Johnson to run toward Islam to prevent him from absconding. Johnson struggled to detain Islam but ultimately handcuffed him to a railing while Islam attempted to pull away from the detective.

As Reed tried to keep Williams in his grasp, Williams "c[a]me out of his hoodie[,]" and pushed off of Reed. Williams fled down the street and crouched behind a car in a driveway. Reed cautiously approached him and saw Williams

4

"fiddling . . . down in his crotch area."  Reed told Williams to "stop reaching" and "don't make me shoot you."  Williams "hooked around" a nearby home and headed to the backyard area.  Reed caught up to him in time to see Williams throw a gun in the air and hear it land on the ground.  Shortly thereafter, backup arrived, the gun was recovered, and Williams and Islam were arrested.

Much of this incident was captured on a cell phone video.  Indeed, before Islam attempted to run and while Williams was still in his car, Bush and another co-defendant, Rana James[2] walked up to the detectives.  The women started questioning the detectives, and yelling, "why you stopping them?" and "let them go[.]"  Johnson later testified that the women were "in [his] investigation" and he could see they were "recording [him] with their cell phones."  Because one of the women was "in [his] direct line of fire on the front passenger side" while he had his gun trained on Williams, Johnson told her to "back . . . up."  He reasoned that if he "had to shoot [Williams, he] didn't want to mistakenly shoot her."  Despite this command, the woman "wasn't listening" and "stayed in [Johnson's] investigation."

---

[2]  James failed to appear in court, and therefore, was not tried with her co-defendants.

Johnson again ordered the women to "back up," to "giv[e] them an opportunity to leave because [they were] in a criminal investigation at this point[.]" Neither woman heeded his commands. Moreover, when Johnson asked a bystander to call 9-1-1 as he struggled to gain control of Islam, one of the women responded, "Hey, yo, don't call . . . nobody." Johnson warned that once law enforcement arrived, he would be "locking [her] up." Undaunted, the female responded, "You're not locking me up, I got you on record. What you locking me up for?" Bush and James stayed on the scene until they were arrested, along with their co-defendants.

## II.

Williams was charged with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) and third-degree resisting arrest by force, N.J.S.A. 2C:29-2(a)(3)(A). Additionally, he was charged in a separate indictment with second-degree possession of a firearm by certain persons, N.J.S.A. 2C:39-7(b). Bush was charged with one count of fourth-degree obstruction, N.J.S.A. 2C:29-1.

The State jointly tried Williams, Islam, and Bush. It produced Reed and Johnson as witnesses and played the footage from the incident that it recovered from James's cell phone. The recording lasted roughly five minutes and

captured the detectives' interactions with the co-defendants from the time Johnson had his gun trained on Williams until other members of law enforcement arrived on the scene to assist the detectives.

Reed testified that after the detectives pulled over Williams's car, he conducted a protective pat down of Islam with negative results. Reed stated he subsequently spotted a silver handgun in the rear pocket of Williams's front passenger seat and promptly alerted Johnson to the gun's presence while Williams was still in the car. Reed identified Bush in court as one of the women who was "yelling at" him after Williams was stopped.

According to Reed, once Williams exited the car, he could see a "large bulge in [Williams's] pants," and suspected Williams had "a weapon on him." Reed testified he only had "one hand to actually hold Khalif Williams" because he had lost his holster and needed to hold his gun in his other hand. Reed worked to "keep [Williams] on scene[,]" believing the suspect had a weapon and anticipating the detectives would "have to make an arrest" after Reed "s[aw] a gun." Reed stated that after Williams broke free and ran to hide behind a car, he continued to suspect Williams had a weapon on him, which is why he ordered Williams to "stop reaching[,]" and "[d]on't make me shoot you please."

A-2543-18

When Johnson testified about the motor vehicle stop, he conceded that on the day of the incident, he did not see the gun spotted by Reed. Nevertheless, the defense did not object when the State played and paused the cell phone footage for Johnson and he testified the video showed a bulge in Williams's pants, "between his groin area and his thigh." Johnson also testified he thought the bulge was "[t]he handgun" because of "the imprint of it." When Johnson was shown another frame from the video, he pointed to the still image and stated, "do you see this imprint right here? That's the gun, I think." He explained that Williams had "the weapon trapped between [a pair of thermals], the jeans and his leg." The State again paused the video toward the end of the recording and Johnson testified the image depicted Reed and Williams walking out of a driveway, "minus . . . the purple hooded shirt and no bulge." Such testimony corroborated the State's theory that by this point in the incident, Williams had disposed of the gun.

Additionally, while Johnson watched the video, he identified Bush on the footage, stating she was "the person who just walked across the screen[.]" He identified her again in another section of the recording, testifying she was "walking out" onscreen.

A-2543-18

At the close of the State's case, each defendant moved for a judgment of acquittal pursuant to Rule 3:18-1. The judge denied their motions, referencing the detectives' testimony, as well as the testimony of other witnesses, and the contents of the cell phone video before finding the evidence at that point in the trial was "sufficient to warrant a conviction and the jury could conclude beyond a reasonable doubt that [each defendant was] guilty of the offense[s] charged."

Regarding Bush's motion specifically, the judge found the evidence produced against her was "sufficient to warrant a conviction" for obstruction. He explained that the cell phone video placed her "in the center of a melee wherein the detectives had weapons drawn and were attempting to effectuate the arrests of [Williams] and [Islam]." Additionally, the judge noted Bush could "be seen walking between the person taking the cell phone video and the grappling officers." He also observed that in Johnson's direct testimony, Bush was identified "as a person who refused to heed his verbal commands during the shuffle and attempted arrest."

After the judge voir dired each defendant and confirmed none wished to testify, he conducted a charge conference with counsel. Bush's attorney objected to certain wording contained in the judge's draft instructions, but he did not object to the instruction pertaining to the obstruction offense. Importantly, when

A-2543-18

he was asked if he wished to include a reference to the grading of the obstruction offense, Bush's attorney responded that he did not want the instruction to contain the "lesser included" disorderly persons charge. The judge accommodated his request.

Following deliberations, the jury found Williams guilty of unlawful possession of a handgun and the certain persons charge, as well as fourth-degree obstruction, a lesser-included charge of resisting arrest. The jury also found Bush guilty of fourth-degree obstruction.

Four days after the jury rendered its verdict, Bush filed a motion to dismiss the indictment against her, or in the alternative, for a new trial, contending the verdict was against the weight of the evidence. She also argued that the judge failed to charge the jury on the lesser-included offense of obstruction and that she was entitled to relief because the trial lasted longer than the jury was told it would.

In a cogent written opinion, the judge denied her application. He found Bush was "within feet of the officers as they physically struggle[d] to subdue the co-defendants[,]" that "Detective Johnson beckoned her to move way because she was in the line of potential fire[,]" and Johnson "testified that she . . . physically challenged the officers throughout the melee." The judge added

10

that "[t]he testimony and video evidence detailed and captured that the officer's attention and focus were distracted from the extremely dangerous situation that he/they were involved in because of Bush's actions interjecting herself into the co-defendants' arrest(s)."

Regarding the jury charge on obstruction, the judge recounted that he had "affirmatively asked defense counsel if he wished to include any lesser included offenses and the defense affirmatively requested that no lesser-included offense be charged."  Moreover, he found that "[t]he proofs were overpowering and devastating to the defense[,]" so there was "no reason to believe that the jury could have acquitted [Bush] on the fourth[-]degree obstruction charge and returned a guilty verdict on the lesser disorderly persons charge of obstruction." Lastly, the judge determined that the "jury panels were well advised of the trial dates" and "[a]ny scheduling issues were resolved with the agreement of counsel." Therefore, he concluded there was no basis to grant Bush a new trial, finding "no prejudice accrued to anyone because of the length of the trial."

On November 9, 2018, Williams appeared before the trial court for sentencing.  The judge analyzed the aggravating and mitigating factors and found that aggravating factors three (risk of reoffense); six (criminal history); and nine (need to deter), N.J.S.A. 2C:44-1(a)(3), (6), and (9), as well as

mitigating factor eleven (excessive hardship), N.J.S.A. 2C:44-1(b)(11), applied. The judge sentenced Williams to a seven-year prison term with a forty-two-month parole ineligibility period for the unlawful possession of a handgun charge; a seven-year term with a five-year parole ineligibility period on the certain persons offense; and an eighteen-month term for the obstruction charge. The judge directed all sentences to run concurrently.

Bush was sentenced the same day. The judge found that aggravating factor nine and mitigating factor ten (amenable to probationary treatment), N.J.S.A. 2C:44-1(b)(10), as well as "other [mitigating] reasons" advanced by Bush's attorney, applied. He sentenced Bush to a two-year period of probation and directed her to complete 200 hours of community service.

### III.

On appeal, Williams raises the following arguments:

POINT I

THE IMPROPER ADMISSION OF THE LEAD DETECTIVE'S LAY OPINION THAT THE CELL-PHONE VIDEO SHOWED A "BULGE" IN DEFENDANT'S PANTS THAT HE BELIEVED TO BE A GUN REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

POINT II

THE COURT'S IMPROPER FINDING AND WEIGHING OF AGGRAVATING FACTORS, AND REJECTION OF MITIGATING FACTORS RENDERS DEFENDANT'S SENTENCE EXCESSIVE.

Bush raises the following contentions for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR A NEW TRIAL WHERE DEFENDANT'S CONDUCT DID NOT VIOLATE N.J.S.A. 2C:29-1.

POINT II

DEFENDANT'S CONVICTION FOR FOURTH DEGREE OBSTRUCTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT OMITTED AN ESSENTIAL PORTION OF THE MODEL JURY CHARGE CONCERNING THE GRADING OF THE OBSTRUCTION OFFENSE AS A FOURTH DEGREE OFFENSE.

POINT III

DEFENDANT'S CONVICTION SHOULD BE VACATED BECAUSE AS APPLIED IN DEFENDANT'S CASE, N.J.S.A. 2C:29-1 IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD. (Not Raised Below).

POINT IV

THE TRIAL COURT COMMITTED PLAIN ERROR BECAUSE THE CLAIMS AGAINST DEFENDANT

13

SHOULD HAVE BEEN SEVERED FROM THE CHARGES AGAINST THE CO-DEFENDANTS BECAUSE THE TESTIMONY PRESENTED BY THE STATE AGAINST THE CO-DEFENDANTS CONCERNING THEIR ALLEGED WEAPON POSSESSION AND POTENTIAL NARCOTICS ACTIVITY WAS HIGHLY PREJUDICIAL TO DEFENDANT, WITH WHOM THE CO-DEFENDANTS HAD NO INVOLVEMENT. (Not Raised Below).

We find these arguments unavailing.

Regarding Williams's Point I, we note that his trial attorney did not object to that portion of Johnson's lay opinion testimony when the detective stated that certain cell phone footage and images showed a bulge in Williams's pants and that he believed the bulge was a gun. Therefore, we review the admission of this testimony for plain error. R. 2:10-2.

The admission of lay opinion testimony is governed by N.J.R.E. 701.[3] "The first prong of N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's 'perception,' which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." State v. Singh, 245 N.J. 1, 14 (2021) (quoting State v. McLean, 205 N.J. 438, 457

---

[3] This Rule provides that: "If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701.

(2011)). "The second requirement of N.J.R.E. 701 is that lay-witness opinion testimony be 'limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue.'" Id. at 15 (quoting McLean, 205 N.J. at 458). Regarding testimony by law enforcement, the Singh Court confirmed "'[f]act testimony has always consisted of a description of what the officer did and saw,'" and "'an officer is permitted to set forth what he or she perceived through one or more of the senses.'" Ibid. (quoting McLean, 205 N.J. at 460).

Here, Johnson acknowledged at trial that he did not see a gun, nor did he witness Williams retrieve a gun during the incident. Johnson also conceded under cross-examination that he simply assumed "the crease in [Williams's] pants [was] 'the gun,'" as he described the contents of the cell phone video presented by the State. Accordingly, we are satisfied it was error to allow this lay opinion testimony because it was not based on Johnson's perception of events at the time of the incident.

Nonetheless, because: Reed testified that he witnessed Williams exit the car and saw a "large bulge in [Williams's] pants" at that time; Reed stated that when he pursued Williams, he believed Williams had "a weapon on him"; Reed witnessed Williams dispose of the gun by throwing it in the air behind a home;

15

and the jury was able to watch the cell phone footage to independently evaluate the contents of the recording, we are not persuaded this limited portion of Johnson's lay opinion testimony was so prejudicial as to meet the plain error standard. In short, we cannot conclude it was "clearly capable of producing an unjust result." R. 2:10-2.

In his argument under Point II, Williams argues he received an excessive sentence. He contends that he received a harsher sentence than warranted, in part, because the judge "improperly considered arrests that did not lead to convictions in finding aggravating factors [three] and [nine,]" and because the judge allowed his perception of society's problem with gun violence to influence his sentencing decision. These arguments are unconvincing.

We review a judge's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). As directed by the Court, we must determine whether:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) the "application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

We also recognize "[a]ppellate review of the length of a sentence is limited[,]" State v. Miller, 205 N.J. 109, 127 (2011), and we are to affirm a sentence, even if we would have imposed a different one, so long as the sentencing judge "properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record[,]" State v. Natale, 184 N.J. 458, 489 (2005) (quoting State v. O'Donnell, 117 N.J. 210, 215 (1989)).

Here, we discern no abuse of discretion in the judge's sentencing decision. Rather, his findings regarding the applicable aggravating and mitigating factors are amply supported by the evidence. Further, when reviewing the record of Williams's sentencing as a whole, we are satisfied the judge's brief mention of Williams's four prior arrests and his limited discussion about the impact of gun violence on society did not unduly sway his sentencing decision.

In fact, the record reflects the judge reviewed Williams's presentence report, his attorney's sentencing memorandum, and letters submitted from Williams's family and friends. The judge also considered Williams's prior criminal history, which included a second-degree robbery. The judge noted that Williams twice violated parole after serving time for the robbery conviction. Moreover, when discussing Williams's instant offenses, the judge stated, "[t]he video didn't lie. It showed a dangerous situation that escalated, where someone

17

very easily could have been killed." Further, the judge determined Williams and Islam engaged in a "wrestling match" with the detectives and that the circumstances leading to his arrest "threaten[ed] serious harm." The judge stated Williams's actions "put lives in danger, including [his] own."

Because Williams's prior conviction for robbery involved a firearm, much like Williams's instant offenses, the judge also found "there [was] no evidence that existed to detract from the reasonable likelihood that [Williams] would offend again if not appropriately sanctioned in this case." After weighing the applicable aggravating and mitigating factors, the judge concluded "a sentence in the middle to lower end of the range is appropriate." Therefore, the judge rejected the State's request that he impose consecutive sentences, opting for concurrent sentences instead, and imposed sentences within the appropriate range. Given our standard of review, and satisfied that Williams's sentence does not "shock the judicial conscience," we see no reason to disturb the judge's sentencing decision. Fuentes, 217 N.J. at 70

Turning to Bush's arguments, she contends in her Point I that because her conduct during the motor vehicle stop did not rise to the level of obstruction, she was entitled to a judgment of acquittal or, alternatively, a new trial. We disagree.

We review a denial of a motion for a judgment of acquittal de novo. State v. Williams, 218 N.J. 576, 593-94 (2014); State v. Brown, 463 N.J. Super. 33, 47 (App. Div. 2020). The motion pursuant to Rule 3:18-1 will be denied "if 'viewing [only] the State's evidence in its entirety, be that evidence direct or circumstantial,' and giving the State the benefit of all reasonable inferences, 'a reasonable jury could find guilt . . . beyond a reasonable doubt.'" State v. Sugar, 240 N.J. Super. 148, 152 (App. Div. 1990) (quoting State v. Reyes, 50 N.J. 454, 458-59 (1967)).

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000). Under Rule 3:20-1:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice . . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

"In considering whether a jury verdict was against the weight of the evidence, our task is to decide whether 'it clearly appears that there was a miscarriage of justice under the law.'" State v. Smith, 262 N.J. Super. 487, 512

(App. Div. 1993) (quoting R. 2:10-1). "We must sift through the evidence 'to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" Ibid. (quoting State v. Carter, 91 N.J. 86, 96 (1982)). However, "an appellate court may not overturn the verdict 'merely because it might have found otherwise upon the same evidence.'" Ibid. (quoting State v. Johnson, 203 N.J. Super. 127, 134 (App. Div. 1985)). "Appellate intervention is warranted only to correct an 'injustice resulting from a plain and obvious failure of the jury to perform its function.'" Ibid. (quoting Johnson, 203 N.J. Super. at 134).

As discussed, the jury found Bush guilty of fourth-degree obstruction. Pursuant to N.J.S.A. 2C:29-1(a):

> A person commits an offense if he [or she] purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.

Obstruction is a "crime of the fourth degree if the actor obstructs the detection or investigation of a crime or the prosecution of a person for a crime, otherwise it is a disorderly persons offense." N.J.S.A. 2C:29-1(b).

Here, the testimony of the detectives and the cell phone video of the incident amply supported the jury's finding that Bush physically interfered with the detectives' investigation as they struggled to gain control of Williams and Islam. Accordingly, the judge aptly noted Bush placed herself "in the center of a melee wherein the detectives had weapons drawn and were attempting to effectuate the arrests of [Williams] and [Islam]." The evidence also was uncontroverted that Johnson directed Bush and James to "back up," to "giv[e] them an opportunity to leave because [they were] in a criminal investigation at this point," yet neither woman heeded his commands. Under these circumstances, we are satisfied the judge properly denied Bush's motions for acquittal and a new trial.

Regarding Point II, Bush contends her conviction should be reversed because the instructions the judge provided to the jury on the obstruction charge were incomplete. We are not persuaded.

It is well established that a related lesser offense must be charged to a criminal jury, even if it is not specifically requested by trial counsel, where that lesser offense is "clearly indicate[d]" by the proofs. State v. Jenkins, 178 N.J. 347, 361 (2004). Although a trial court does not have the duty to "scour the statutes to determine if there are some uncharged offenses of which the

21

defendant may be guilty[,]" see State v. Brent, 137 N.J. 107, 118 (1994) (quoting State v. Sloane, 111 N.J. 293, 302 (1988)), the court is obligated to charge the jury, sua sponte, with a lesser crime "when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense[,]" Jenkins, 178 N.J. at 361; see also State v. Thomas, 187 N.J. 119, 136 (2006).

On the other hand, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e); see also State v. Cassady, 198 N.J. 165, 177 (2009).

Here, Bush's attorney did not request that the lesser-included disorderly persons offense of obstruction be included in the jury charge. Instead, he specifically asked the judge not to include it. Therefore, the State contends Bush's argument is barred by the invited-error doctrine.

"Trial errors which [are] induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. Santamaria, 236 N.J. 390, 409 (2019) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)). But in a criminal case, "[s]ome

measure of reliance by the court is necessary for the invited-error doctrine to come into play." Jenkins, 178 N.J. at 359.

Governed by these principles, we are convinced that even if Bush's argument is not barred by the invited-error doctrine, the judge did not err in denying Bush's motion for a new trial based on the wording of the obstruction charge, and finding

> there [was] no reasonable basis to have charged the offense [of obstruction] as a disorderly persons offense as the proofs did not warrant this. The evidence of Bush's physical interference with an arrest was overwhelming[,] given the testimony of the officers and the video of the incident. The proofs were overpowering and devastating to the defense. You could see and hear Bush's actions, words, and conduct. You could see the officers being obstructed and impaired in their efforts to detain and arrest Bush's co-defendants while firearms were drawn by officers and possessed by co-defendant Khalif Williams. Frankly, this court remains astonished that no one was shot given Bush's conduct that without a doubt escalated and intensified the shocking incident. . . . . This court finds that there is no reason to believe that the jury could have acquitted the defendant on the fourth[-]degree obstruction charge and returned a guilty verdict on the lesser disorderly persons charge of obstruction.

The judge's findings are amply supported on this record. Accordingly, his legal conclusions about the obstruction charge provided to the jury are unassailable.

23

Regarding Bush's contention under Point III, she newly argues that her conviction should be vacated because N.J.S.A. 2C:29-1 is "unconstitutionally vague and overbroad." Again, we disagree.

We begin with the premise that "statutes are presumed constitutional[.]" Whirlpool Props., Inc. v. Dir., Div. of Tax'n, 208 N.J. 141, 175 (2011). Indeed, we hesitate to find a constitutional infirmity absent a clear expression of the law from the United States Supreme Court, particularly where it would disturb settled law. Id. at 176. Instead of striking down a law on constitutional grounds, we endeavor to narrowly construe it to eliminate "doubts about its constitutional validity" so long as the law is "'reasonably susceptible' to an interpretation that will render it constitutional." State v. Carter, 247 N.J. 488, 518-19 (2021) (quoting State v. Burkert, 231 N.J. 257, 277 (2017)). Whether a statute is unconstitutional is "an issue of law subject to de novo review." State v. Drake, 444 N.J. Super. 265, 271 (App. Div. 2016) (citing State v. Pomianek, 221 N.J. 66, 80 (2015)).

Vagueness "is essentially a procedural due process concept grounded in notions of fair play." State v. Saavedra, 222 N.J. 39, 68 (2015) (quoting State v. Lee, 96 N.J. 156, 165 (1984)). Criminal statutes that are impermissibly vague are unconstitutional. State v. Afanador, 134 N.J. 162, 170

(1993) (quoting Town Tobacconist v. Kimmelman, 94 N.J. 85, 118 (1993)).  "A law is void as a matter of due process if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'"  Town Tobacconist, 94 N.J. at 118 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).  Further, a statute is overbroad "if in its reach it prohibits constitutionally protected conduct."  Grayned v. City of Rockford, 408 U.S. 104, 114 (1972).  Stated differently, if a statute suffers from overbreadth, it implicates substantive due process concerns about "excessive governmental intrusion into protected areas."  In re Hinds, 90 N.J. 604, 618 (1982).

Recently, in State v. Fede, 237 N.J. 138, 148-49 (2019), our Supreme Court discussed N.J.S.A. 2C:29-1(a), noting:

> The statute is unambiguous.  It defines the explicit means by which one may be criminally liable for obstruction and requires affirmative interference.  The statute's second sentence informs interpretation of the statute's meaning overall, namely, that the obstruction statute in its entirety requires as a necessary element an act of affirmative interference.  Otherwise, the outer contours of the statute would be difficult to limit.  For example, a defendant could be convicted of obstruction for sitting on his couch and declining to respond to [a] police officer's knock.

The Court further stated:

> The statute qualifies <u>what</u> conduct is prohibited —
> including obstruction of the administration of law —
> by reference to <u>how</u> the activity is carried out —
> including by means of "physical interference or
> obstacle." By the plain and ordinary meaning of the
> terms of the statute, criminal liability for obstruction
> stems only from certain modes of behavior.
>
> [<u>Id.</u> at 148.]

Mindful of our standard of review, as well as the Court's recent comments about N.J.S.A. 2C:29-1(a) and our own reading of the statute, we are satisfied the statute's terms are plain enough and sufficiently limited in scope so as to pass constitutional muster. Stated differently, we decline to conclude the obstruction statute suffers from vagueness or overbreadth.

Finally, Bush raises the novel argument that her case should have been severed from that of her co-defendants because the testimony presented by the State against Williams and Islam was "highly prejudicial." We disagree.

Our court rules provide that "[t]wo or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or a similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together[.]" <u>R.</u> 3:7-6. However, the court may "order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief" where "it

A-2543-18

appears that a defendant . . . is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment[.]"  R. 3:15-2(b).

A mere claim of prejudice is insufficient to support a motion to sever. State v. Moore, 113 N.J. 239, 274 (1988).  A defendant is not entitled to severance simply because he or she believes a separate trial "would offer . . . a better chance of acquittal."  State v. Johnson, 274 N.J. Super. 137, 151 (App. Div. 1994) (quoting State v. Morales, 138 N.J. Super. 225, 231 (App. Div. 1975)).

"Central to the inquiry is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'"  State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (alteration in original) (quoting State v. Pitts, 116 N.J. 580, 601-02 (1989)).  Where the evidence would be admissible in separate trials, joinder is permissible "because 'a defendant will not suffer any more prejudice in a joint trial than he [or she] would in separate trials.'"  Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

Here, Bush did not file any pre-trial motion seeking severance.  Moreover, on appeal, she fails to assert any cogent reason why severance sua sponte was

either appropriate or required. Further, it is uncontroverted that Bush's actions were connected to the acts of her co-defendants so that a joint trial was "'preferable' because it serve[d] judicial economy . . . and allow[ed] for a 'more accurate assessment of relative culpability.'" State v. Weaver, 219 N.J. 131, 148 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)). Accordingly, we cannot conclude the judge committed plain error in failing to sua sponte order that Bush's charge be severed from that of her co-defendants. R. 2:10-2.

In sum, we affirm the convictions of Williams and Bush, and affirm Williams's sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION